## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND

LAUREN HOLMES
  912 West Franklin Street
  Baltimore, MD 21223

NICOLE LEE
  930 West Franklin Street
  Baltimore, MD 21223

LUELLA LAWSON
  501 North Fremont Avenue
  Baltimore, MD 21201

And

JUAQUETA BULLOCK,
  908 West Franklin Street
  Baltimore, MD 21223

        Plaintiffs,

  v.

BALTIMORE CITY POLICE DEPARTMENT
  601 East Fayette Street
  Baltimore, MD 21202

And

THE MAYOR AND CITY COUNCIL OF BALTIMORE
  100 Holliday Street
  Baltimore, MD 21202

And

KEVIN DAVIS, in his individual capacity,

And

JOHN DOES (1-10), in their individual capacities,
  601 East Fayette Street
  Baltimore, MD 21202

        Defendants.

Case No. _____

1

## COMPLAINT FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF

Plaintiffs bring this action for damages, declaratory relief, and injunctive relief against the Baltimore City Police Department ("BPD"), the Mayor and City Council of Baltimore ("City" or "City of Baltimore"), former Baltimore City Police Commissioner Kevin Davis, and John Does (1-10)(collectively "Defendants").

## NATURE OF THE ACTION

1.      In November 2017, residents of the Harlem Park neighborhood in Baltimore were subjected to a six-day lockdown by Baltimore City police following the death of BPD Detective Sean Suiter in that community.  Baltimore's highest officials, including then-Police Commissioner Kevin Davis, claimed at the time that the lockdown was necessary to preserve a "crime scene."  But the BPD has never treated such a large area as a crime scene in similar circumstances, and never before locked down multiple blocks in a residential neighborhood for days on end.  The lockdown violated the constitutional rights of Harlem Park residents and BPD's own policies.  There was no reasonable justification for the lockdown because no reasonable police official could have believed that the crime scene was as extensive as the cordon erected by the BPD, or necessitated the level of police intrusion into the private and lawful daily affairs of Harlem Park residents.

2.      The BPD initially locked down a six square block area (though the boundaries changed over time), which they enforced through a massive and unprecedented police operation, with a mobile command unit, armored trucks, police tape across each street and sidewalk entering the cordon, and armed police posted on every block, alleyway, and corner, and police checkpoints at every intersection.  The lockdown was indiscriminate, subjecting all of the residents of the area to stops and questioning without regard to the BPD's lack of

reasonable suspicion for any encounter, making residents of Harlem Park feel like prisoners in their own homes.

3.      During the unprecedented lockdown, BPD officers required residents to obtain police permission to enter and leave their homes or cordoned area, denied anyone else permission to enter, and blocked all vehicle traffic in the area.  Throughout the lockdown, if someone sought to enter or leave the cordoned area, BPD officers sought to stop them without reasonable and articulable suspicion that they had committed, were committing, or were about to commit a crime.  BPD officers generally required those stopped to provide identification, such as a driver's license, and to give their name, address, and date of birth.  In some cases, BPD officers asked for phone numbers and, in others, questioned those stopped about where they were coming from, where they were going, where they worked, and when they would return.  The identifying information was generally collected by officers in writing.  Some or all of the identifying information collected was retained by police and some or all of the names collected were checked against law enforcement databases.  Some of the information collected was given to the team of officers investigating Detective Suiter's death.

4.      The lockdown also caused extraordinary disruption to the daily lives of families in the neighborhood for no legitimate reason.  For six days, Harlem Park residents were told to carry identification with them at all times, and to show identification at checkpoints, and often at their front doors.  They couldn't leave their homes without being accosted by police officers at their doorstep or at the nearest checkpoint to be identified; have family or friends come over without police questioning and permission; come home from work without reporting to a police officer; bring their children to school without being stopped and questioned by police in front of their children; or step outside for any reason without being under surveillance and possibly recorded.  At times, some residents were also forced to have police escort them to and from

their homes, answer questions about their personal lives, and get permission to go outside.  The restrictions, requirements, and interrogations made normal daily activities like going to school and work stressful and invasive experiences.  For some Plaintiffs, the BPD's actions caused them stay home as much as possible during the lockdown, unwilling to run a gauntlet of police questioning and demand for identification simply to come and go from their homes.  The lockdown also made grocery shopping, having family over, having a landlord fix something, and getting to and from home more stressful, difficult, or impossible.  A school bus for a developmentally disabled child could not reach the student's house to bring him to school, deliveries could not be completed, residents were forced to sleep elsewhere, people who were visiting were forced to stay, dogs were stuck inside, and children were left with their caretakers and separated from their mothers.

5.      The BPD's extraordinary actions over the course of the lockdown, combined with an already-pervasive distrust of Baltimore police due to decades of BPD abuse and misconduct in Baltimore's poor and predominantly Black neighborhoods, created a tense atmosphere of uncertainty among Plaintiffs about what the BPD might do.  The experience of having to show their papers to come and go from their homes made Plaintiffs feels like second class citizens in their own city.  To Plaintiffs, the BPD lockdown exemplified the total lack of value or importance that the BPD or City leaders accorded to the lives and concerns, and – most importantly – the civil rights of Harlem Park residents.

6.      Sadly, the BPD's actions in Harlem Park detailed in this Complaint perpetuate the BPD's long history of treating the neighborhood's residents as though they simply do not matter to the City's policy-making officials.

## **JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and 1367.

8.      Venue is proper under 28 U.S.C. § 1391(b)(2) and Local Rule 501.4(a)(i).  All of the events giving rise to the claims herein took place in Baltimore City, Maryland, and defendants are or were employees of the BPD, or are government entities.

**PARTIES**

A.      **The Plaintiffs**

9.      Plaintiff Lauren Holmes has been a resident of Harlem Park since 2013.  She is a research assistant.  Ms. Holmes has three sons, D'Sean, who is sixteen, Quentin, who is nine, and Mikhail, who is ten and a daughter, Jaida-Marie, who is twelve.  As detailed more fully below, Ms. Holmes and her family were directly harmed by the BPD lockdown in Harlem Park.

10.     Plaintiff Nicole Lee has been a resident of Harlem Park since 2011.  She is a geriatric nursing assistant.  Ms. Lee has two sons, Wonye, who is eleven years old, and Daeshaun, who is seventeen and has special needs due to autism, and a twenty-four year old daughter, Jessica.  She also helps care for her mother, Georgette, who lives with her.  As detailed more fully below, Ms. Lee and her family were directly harmed by the BPD lockdown in Harlem Park.

11.     Plaintiff Luella Lawson has been a resident of Harlem Park since 2000.  She is a housekeeper.  Ms. Lawson shares her home with her daughter, Andrea, and her two grandchildren, De'Andre and Da'Kiara.  As detailed more fully below, Ms. Lawson and her family were directly harmed by the BPD lockdown in Harlem Park.

12.     Plaintiff Juaqueta Bullock has been a resident of Harlem Park since 2011.  She is a nursing assistant.  She has two daughters, Lauren, who is ten, and Bria, who is twenty, as well

as a son, Jay, who is thirteen.  As detailed more fully below, Ms. Bullock and her family were directly harmed by the BPD lockdown in Harlem Park.

**B.      Defendants**

     a.      <u>Entities</u>

     13.      Defendant Baltimore City Police Department ("BPD") is the police department for the City of Baltimore.  The Mayor appoints the Commissioner of the BPD with the advice and consent of the City Council, and has the power to remove the Commissioner.  The City Council holds hearings on BPD policy and sets the BPD budget.  BPD officers are City employees and the City funds the officers' pensions.  The City pays judgments rendered against the BPD and against officers acting within the scope of their employment.  The BPD is treated as a local government entity under the Local Government Tort Claims Act, Md. Code, Cts. & Jud. Proc. § 5-301(d)(21).  No state official or agency exercises any supervisory authority over the BPD or the Police Commissioner.  The BPD operates only within the City of Baltimore. The BPD is the custodian of the records about the Plaintiffs collected pursuant to the BPD's actions in Harlem Park described herein.

     14.      Defendant Mayor and City Council of the City of Baltimore, a municipal corporation, is the corporate name for the City of Baltimore.

     b.      <u>Individuals</u>

     15.      At all times relevant to this Complaint, Defendant Kevin Davis was Commissioner of the BPD and was the policymaking official ultimately responsible for the BPD's policies, practices, and actions affecting Harlem Park during the relevant time period. Defendant Davis is sued in his individual capacity.

     16.      Defendants John Does 1-10 are fictitious names for those senior policymaking BPD officials who, at all times relevant to this Complaint, ordered and directed the actions of

BPD officers in Harlem Park complained of herein.  Defendants John Does 1-10 are sued in their individual capacities.

## GENERAL ALLEGATIONS

**A.     Background to the Lockdown**

17.     On Wednesday, November 15, 2017, at about 4:36 PM, BPD homicide Detective Sean Suiter suffered a fatal gunshot wound to his head, from his own service weapon, in a vacant lot immediately west of 959 Bennett Place in Harlem Park.

18.     Although the Medical Examiner initially ruled Detective Suiter's death a homicide, an Independent Review Board subsequently hired by the BPD to review its investigation into Detective Suiter's death concluded that he had committed suicide.  *See* Independent Review Board, *Report to the Commissioner of the Police Department of Baltimore City Concerning an Independent Review of the November 15, 2017 Incident and its Aftermath* (Aug. 27, 2018), https://www.baltimorepolice.org/sites/default/files/General%20Website%20PDFs/Suiter%20Report%20Public.pdf ("IRB Report").

19.     On the day he suffered the fatal gunshot wound, Detective Suiter was in Harlem Park with Detective David Bomenka, not his regular partner, ostensibly looking for a potential witness to a triple homicide that occurred in December 2016.  According to Detective Bomenka, Detective Suiter said he saw a suspicious person in the alley between Bennett Place and Franklin Street as they were driving past, so the two detectives began to search for that person on foot.  Detective Bomenka, who was located at the corner of Bennett and Schroeder, said he saw Detective Suiter run suddenly into a vacant lot adjacent to 929 Bennett Place.  Detective Bomenka then heard a shout followed by multiple gun shots.  He said that he ran to the lot within a few seconds, where he found Detective Suiter lying on the ground with a gunshot

wound to the head.  Detective Bomenka reported that he did not see anyone else in the lot, or fleeing from it.

20.     Detective Suiter was taken to the University of Maryland Hospital and was pronounced dead the following day due to a gunshot wound to the head.

**B.      The Lockdown**

21.     In the immediate aftermath of this incident, the BPD locked down the Harlem Park neighborhood by establishing a cordon around multiple blocks.  The cordoned area was marked with police tape, and BPD officers were stationed at every intersection around the perimeter and within the cordoned area.  At the direction of BPD officials, BPD officers blocked vehicle traffic from entering the cordoned area, and generally prohibited persons from entering if they did not live within the cordoned area.  Both prohibitions lasted for the duration of the lockdown (although the perimeter of the cordon shifted over time).  Although the cordon was initially larger, even the somewhat smaller sustained cordon encompassed at least 100 houses, as well as two stores and a church.

22.     Initially, and as late as the afternoon of November 16, some residents who lived within the cordoned area were denied entry and could not go back to their homes.  In addition, until sometime on November 16, some residents living within the cordoned area who attempted to leave their homes were forcefully told by BPD officers that they had to remain inside.  There were initially many dozens of police officers from multiple agencies searching abandoned buildings, interviewing residents at their doors or in their homes, standing at checkpoints, and patrolling the neighborhood, including many with rifles.  In addition, there were multiple SWAT team searches of buildings.  During that same initial period there were also police sharpshooters posted on the roofs of multiple buildings, helicopters flying overhead, and mobile police command posts set up in the community.  During the entire period that the lockdown was

in effect there were police officers stationed at every intersection around the cordon and within

it operating checkpoints where residents were stopped.

23.     In addition, and at the direction of BPD policymaking officials, throughout the

duration of the lockdown, BPD officers sought to stop any persons who wished to enter or walk

within the cordoned area, at its perimeter or inside it, without reasonable and articulable

suspicion that they had committed, were committing, or were about to commit a crime.  BPD

officers generally required those stopped to provide identification, such as a driver's license,

and to give their name, address, and date of birth.  In some cases, BPD officers asked for phone

numbers and, in others, questioned those stopped about where they were coming from, where

they were going, where they worked, and when they would return.  Residents wishing to leave

the cordoned area were also subjected to the same stops, questioning, and demand for

identification.  In virtually none of these stops were the stopped persons questioned about

Detective Suiter's shooting.

24.     BPD officers who stopped residents sometimes gave them the yellow copy of a

Citizen/Police Contact Receipt form documenting the stop and containing their identifying

information.  Residents were sometimes told that they could present the Receipt form to officers

in future encounters to show that their information had already been collected.  Residents were

sometimes told that they must carry their Receipt with them at all times until the police had left

the area.

25.     BPD officers repeatedly told residents – falsely – that the collection of

information was just a formality, and that nothing would be done with it.  In point of fact, one

significant purpose of the BPD collecting identification information in Harlem Park during the

lockdown was to allow the BPD to run law enforcement database checks on the stopped

individuals.  The BPD did exactly that with respect to at least some of the individuals stopped

during the lockdown, including Plaintiffs, despite the absence of a reasonable articulable

suspicion that the stopped person was committing, did commit, or was about to commit a crime.

On information and belief, the data collected remains in BPD files.

26.     As a result of the lockdown, residents lived for six days in a virtual police state

where they needed police permission to come and go from their homes while BPD officers

subjected the residents to stops without a reasonable and articulable suspicion that they had

committed, were committing, or were about to commit a crime.

27.     Residents, including Plaintiffs, reasonably did not feel free to ignore BPD officer

demands, due to the numbers of officers, the ubiquitous existence of yellow police "Do Not

Cross" tape, and the BPD officers' statements, such as those documented on body-worn camera

(BWC) footage obtained via a public records request, which included the following:  "you

cannot go in there without an ID"; "in order for you to be able to walk down here, we have to be

able to ID you"; "we need photo ID"; "you're allowed to go to your house now."

28.     The court-appointed monitoring team assessing the BPD's compliance with a

United States Department of Justice consent decree reviewed the BPD's actions in Harlem Park

following the death of Detective Suiter in its first monitoring report.  Baltimore Police

Department Monitoring Team, *First Semiannual Report* (July 18, 2018), available at

https://www.bpdmonitor.com/s/BPD-First-Semiannual-Report-7-18-18.pdf.  That report

concluded that on the night of the shooting, the BPD SWAT unit cleared nine homes on the 900

block of Bennett Place and three homes on Franklin Street that backed up to the vacant lot

where Detective Suiter was found, in order to dispel any threat that the shooter was in the area.

The BPD then waited more than 24 hours before clearing another 34 homes on the 900 blocks

of Bennett Place and Franklin Streets on November 17.  The vast majority of those homes, 32 of

34, were vacant or impossible to enter due to their condition or being sealed.  The BPD made no

effort to clear any other homes after November 17, 2017.  In addition, during the duration of the

cordon, BPD officers did not spend "much time, if any, combing the several streets within the

perimeter for forensic evidence."

29.     Nevertheless, the BPD cordon remained in place from November 15, 2017

through November 20, 2017 (with shifting boundaries), though for a brief time on November

19, the cordoned area was narrowed to the perimeter of the vacant lot where Detective Suiter

was found.  The orders to maintain the perimeter beyond the vacant lot through November 19

and to re-establish it on November 20 came from the highest levels of the Department,

including the then-Commissioner.  Indeed, on November 20, 2017, Police Commissioner Davis

responded to criticism of the lockdown by saying "I would much rather endure some predictive

criticism from the ACLU and others about that decision, than endure a conversation with

Detective Suiter's wife about why we didn't do everything we possibly could do to recover

evidence and identify the person who murdered her husband."  Justin Fenton, *Baltimore Police

Return To Scene Of Detective's Killing, Say New Evidence Found*, The Baltimore Sun (Nov. 20,

2017), https://www.baltimoresun.com/maryland/baltimore-city/bs-md-ci-detective-monday-

20171120-story.html.

30.     No reasonable police commander could have believed, given the circumstances,

that the crime scene extended as far as the BPD cordon (other than for the period of time on

November 19, when the crime scene was limited to the vacant lot where Detective Suiter

suffered the gunshot wound).  And no reasonable police commander could have thought it

necessary to deny residents beyond the immediate area of the vacant lot where Detective Suiter

was found permission to enter or leave their homes.  No reasonable police commander could

have thought it was reasonable to deny non-residents the ability to visit residents within the

cordoned area for six days.  And no reasonable police commander could have thought it

reasonable (or lawful) to demand that, for six days, and without a reasonable and articulable suspicion that the person had committed, was committing or was about to commit a crime, all persons who wished to enter, leave, or walk within the cordoned area, should be required to provide to police their name, address, date of birth, driver's license or state identification number, phone number, and destination, and required to show identification proving the person's residence, so that names could be checked against police databases (or for any other reason).  As the Monitoring Team noted in their July 2018 Report, multiple BPD commanders noted that they had not held other homicide scenes for more than a day, much less one spanning several residential blocks for nearly five days.

31.     The BPD lockdown also violated the BPD's own policies.  BPD issued Policy 1112 "Field Interviews, Investigative Stops, Weapons, Pat-Downs & Searches" on August 26, 2017.  At all times relevant to this Complaint, BPD Policy 1112 stated in pertinent part:

a.      "[O]fficers must be able to clearly document reasonable articulable suspicion for an investigative stop, the reasonable articulable suspicion for a weapons pat-down, and the probable cause for a search. An investigative stop does not automatically justify a weapons pat-down or a search."

b.      "Reasonable Articulable Suspicion" meant "[r]eason to believe, based on the officer's training and experience, that an individual has committed, is committing or is about to commit a crime."

c.      "Field Interview" meant "[c]onduct that places the officer in a consensual face-to-face communication with a person under circumstances in which the person does not have to respond to questions and is free to leave."

32.     Although at least some BPD officers filling out the Citizen/Police Contact
Receipt forms checked the box on the form indicating that they were conducting a "field
interview," the stops and questioning were not field interviews, because the residents were not
free to ignore the BPD officers' directions and questioning.  And, as noted above, Plaintiffs
reasonably did not feel free to ignore the BPD officers' directions and questioning.

33.     Although the Baltimore Sun's homicide database,
https://homicides.news.baltimoresun.com, indicates that there have been at least 11 people
killed since 2013 within a three-block radius of where Detective Suiter suffered his fatal
gunshot wound, the BPD has never before set up a similar multi-block cordon for six days,
stopped everyone coming and going, and recorded their identifying information.

## C.     Plaintiffs' Experience

### a.     Lauren Holmes

34.     On Wednesday, November 15, Plaintiff Lauren Holmes was home with her
children, mother-in-law Toya, and Toya's boyfriend Earl.  Although they heard police sirens,
they were unaware of Detective Suiter's death.  Ms. Holmes and Toya left their home at about
5:40 PM, without being stopped, to go to Cheat Day Bar and Grill in Pigtown for crab night.
While they were at dinner, Toya's boyfriend Earl, who was watching the children at Ms.
Holmes' home, called to tell them that there was a shooting in the neighborhood and that when
he let the dog out in the backyard, a SWAT team had rushed toward him with their guns drawn,
ordering him to go back inside.  Ms. Holmes' children were just inside the door and saw and
heard the armed BPD officers shouting, which frightened them.

35.     When Ms. Holmes and Toya returned home around 10:00 PM that night, a BPD
officer—without a reasonable articulable suspicion that she had committed, was committing, or
was about to commit a crime—stopped Ms. Holmes at the cordon on Franklin Street by the

Route 40 entrance ramp, and demanded to see her identification.  Because her driver's license did not have her current address, the BPD officer said that she needed proof that she lived there or she would not be permitted to go home.  Fortunately, she found a few bills that listed her name and her Franklin Street address in her car and provided those to the BPD officer in addition to her identification.  The BPD officer recorded the information in a Citizen/Police Contact Receipt form, and gave her the yellow copy.  Ms. Holmes then walked to her home to get Earl and the children so that they could all drive Toya and Earl home.  Ms. Holmes then returned and parked outside of the cordon.  She had to show her yellow receipt in order to be allowed to walk home.  Ms. Holmes saw other people being turned away at the cordon that evening, and felt scared by the heavy police presence and the confusing rules about who could and could not get in to Harlem Park.

36.     Ms. Holmes' children attended a charter school in east Baltimore so she typically drove them to school.  However, on Thursday morning, November 16, Ms. Holmes was unable to take her children to school or go to work, because BPD officers told them to go inside when they attempted to leave their home to get to her car.  She tried to leave several times that morning but each time BPD officers in front of her home would not allow her to leave.

37.     On Friday, November 17, Ms. Holmes was able to drive her children to school and go to work, but they were stopped by a BPD officer on the way to her car, and she was required to show her ID and yellow receipt to leave.  When she returned home from work at around 4:00 PM, a BPD officer required identification again, and then escorted her to her door.

38.     Over the weekend, some BPD officers recognized Ms. Holmes because they were stationed outside her house, and did not require her to show her yellow receipt and identification, but other officers who did not recognize her required her to do so.

39.     Ms.  Holmes was very upset by the lockdown because she thought that the BPD officers would never have engaged in similar practices in wealthier or white neighborhoods. She was upset that she had to explain to her children that they were all being treated differently because of where they lived.  She also thought that the lockdown made no sense because anyone who had shot Detective Suiter would have left long before the cordon was put in place (which must have been sometime after Ms. Holmes left her house at around 5:40 PM on November 15).  And the experience of having to constantly show identification or a yellow slip, and get BPD officer permission to come and go from her home made her feel like she was living under martial law.

40.     Ms. Holmes wants her name and personal information, which she was required to give, removed from any police database or records, in connection with the cordon in Harlem Park or the investigation into Detective Suiter's death.

41.     None of the BPD officers who demanded her identification ever asked her any questions about or related to the shooting of Detective Suiter.

b.      <u>Nicole Lee</u>

42.     On Wednesday, November 15, 2017, Plaintiff Nicole Lee was at the University of Maryland Hospital when Detective Suiter suffered the gunshot wound.  Her then nine-year-old son Wonye was home with her mother, Georgette Badget, along with Ms. Lee's niece's one-year-old baby.  Due to poor cellphone reception in the hospital, Ms. Lee's mother had trouble reaching her to report on the police activity and to tell her that her then fifteen year-old autistic son, Daeshaun, had not come home from school and that no one knew where he was.

43.     Daeshaun was enrolled at his school in a special program for students with autism.  Due to the BPD lockdown, the bus that normally took Daeshaun to and from school

15

was prevented from dropping him off at home.  As Ms. Lee learned later, Daeshaun's phone

was dead that afternoon, so he was unable to make or receive calls.

44.     When Ms. Lee left the hospital, she received the messages from her mother

about the lockdown and Daeshaun not having returned home from school.  However, she was

unable to walk home because the street was blocked off.  Her brother picked her up in his car

and they attempted to drive to her Harlem Park home, but found all of the streets blocked by

police, who were waving all of the cars away.  After driving around to all the possible entry

points into the neighborhood, they eventually went to Ms. Lee's brother's house on Penrose

Avenue.

45.     In the meantime, Ms. Lee's niece, Shakira Carroll, went to Daeshaun's school,

where she found Daeshaun waiting on the school bus with the bus driver.  Ms. Carroll and

Daeshaun attempted to walk to Ms. Lee's Harlem Park home, where Ms. Carroll's one-year-old

baby was with Ms. Lee's mother, but they were turned away at the cordon even though

Daeshaun told police that he lived there.  The BPD officer who spoke to them said that they

could not get through unless they wanted to get shot, which scared Daeshaun, because he

interpreted it to mean that the police would shoot them.  Ms. Carroll eventually took Daeshaun

to her friend's nearby house, where they remained until the next morning.

46.     Ms. Lee spent the evening of November 15 talking to her mother on the phone,

because Ms. Badget was scared about being home alone with the baby, and frightened by the

police questioning her about the shooting.  Ms. Lee simply wanted to get home, help take care

of the children, take a shower, and sleep.  She was also worried about what BPD officers were

doing and why they were asking her mother questions, and was frustrated that she could not be

there to help.

47.     The next morning, November 16, at around 5:30 AM, before her brother went to work, he and Ms. Lee again attempted to drive to her Harlem Park home, but were again prohibited from entering at the cordon.  Consequently, she returned to her brother's house while her brother went to work.  Daeshaun, who had been unable to go home to sleep or shower or change clothes, and was not at his home where his bus stop is, could not attend school that day.  Instead, Ms. Carroll brought Daeshaun to Ms. Lee's brother's house.  Wonye also missed school that day, because Ms. Badgett could not leave the baby to walk him to school and because he was too young to walk to school on his own.  At 2:30 PM, when Ms. Lee's brother returned from work, they parked outside of the cordoned area of the neighborhood, and Ms. Lee walked to her home on Franklin Street.  Ms. Lee was relieved to finally be home and with her whole family.

48.     On the evening of November 16, around 7:00 PM, Ms. Lee left her home to walk to the corner store for groceries.  Near the corner of Franklin Street and Fremont Avenue, a BPD officer—without a reasonable and articulable suspicion that she had committed, was committing, or was about to commit a crime—stopped Ms. Lee and required her to give the officer her driver's license so that the officer could record her name, address, driver's license number, date of birth, and phone number.  The officer also asked her to state her address.  The BPD officer recorded all of her identifying information on a Citizen/Police Contact Receipt form and gave her the yellow copy of that Receipt.  The officer checked the box stating that the reason for the stop was a "field interview," even though Ms. Lee did not feel free to ignore the officer's commands.  The fact that the BPD officer, without any justification, asked her for her address in addition to demanding her identification, made her feel that the BPD did not believe her.

49.     On Friday, November 17, Daeshaun again could not go to school because the bus could not get to the pick-up location on Franklin Street.  Ms. Lee, who had to walk her younger son to school, did not want Daeshaun to attempt to cross the cordon or walk to school alone. When Ms. Lee walked her son Wonye to school, a BPD officer—without a reasonable and articulable suspicion that they had committed, were committing, or were about to commit a crime—stopped Ms. Lee and her son and required her to give the officer her driver's license and show the Citizen/Police Contact Receipt form she received the night before.  On her way back from Wonye's school, Ms. Lee went to the grocery store.  When she attempted to return home with her groceries, a BPD officer—without a reasonable and articulable suspicion that she had committed, was committing, or was about to commit a crime—stopped Ms. Lee at the cordon yet again, and required her to show her yellow  receipt.  This time, however, the officer who stopped her accompanied her as she walked home from the cordon checkpoint, and stayed out front watching her enter her home until she closed the door.  Ms. Lee felt like she was a prisoner who could not even walk on her own street free from police surveillance.

50.     The fact that she was being made to show identification or the yellow receipt, and submit to questioning from a BPD officer, each time she came or went from her home caused Ms. Lee to limit her comings and goings during the duration of the lockdown in a manner she would not have under normal circumstances—she left only when necessary and tried to do all of her errands in the same trip to limit the number of times she had to cross the cordon (and did not do some errands she otherwise would have).  In fact, Ms. Lee does not recall leaving her home at all on Saturday or Sunday, November 18 and 19, as a result of the lockdown.

51.     Although the whole family normally gathers at Ms. Lee's home for Thanksgiving, which was only a few days after the lockdown ended, they did not have their

traditional Thanksgiving family gathering that year because everyone in her home felt traumatized by the multi-day lockdown and the pervasive anxiety and mistrust it left in the community.

52.     Ms. Lee wants her name and personal information, which she was required to give, removed from any police database or records, in connection with the cordon in Harlem Park or the investigation into Detective Suiter's death.

53.     None of the BPD officers who demanded her identification ever asked Ms. Lee any questions about or related to the shooting of Detective Suiter.

        c.     <u>Luella Lawson</u>

54.     Luella Lawson was home with her daughter and grandchildren on November 15 at the time Detective Suiter suffered the gunshot wound.  Her grandchildren called her downstairs saying that something was happening outside.  Ms. Lawson noticed a large number of armed BPD officers right outside her door, unlike anything she had ever seen before.  Ms. Lawson, together with her family, had planned to go out to dinner in memory of her deceased son's birthday, but when they attempted to leave their home, they were told by BPD officers that they had to go back inside.  When they later attempted to go out the back door, they were again told that they had to remain inside.  They eventually left out the back door when they realized that the officers were no longer posted behind their house.

55.     On Thursday, November 16, Ms. Lawson left at around 6:00 AM to catch the bus for work at Johns Hopkins Bayview Hospital.  As soon as she left her home, a BPD officer—without a reasonable articulable suspicion that she had committed, was committing, or was about to commit a crime—stopped her and demanded to see her identification.  Upon reviewing her information, the officer filled out a Citizen/Police Contact Receipt form and gave her the yellow copy of that Receipt.  On that Receipt, the BPD officer checked "Field

Interview" and "Warrant Check."  When she realized, when reviewing the form later that day, that a warrant check had been done, Ms. Lawson felt offended, because she had done nothing remotely unlawful and had cooperated with the BPD officer.  She thought that warrant check wrongly and unfairly implied she was a criminal simply because of where she lived.

56.     Upon arriving home later that day, BPD officers, again without reasonable articulable suspicion that she had committed, was committing, or was about to commit a crime, stopped Ms. Lawson at Murphy Lane and Fremont Avenue as she walked home from the bus stop at Saratoga and Greene Streets, and required her to show her identification in order to be allowed to get home.

57.     On Friday, November 17, BPD officers, again without reasonable articulable suspicion that she had committed, was committing, or was about to commit a crime, stopped Ms. Lawson both on her way to and from work, and required her to show her identification and her copy of the Receipt form in order to be allowed to leave or return home.

58.     As a result of the lockdown, Ms. Lawson stayed home on the weekend, because she did not feel free to come and go.

59.     Ms. Lawson wants her name and personal information, which she was required to give, removed from any police database or records, in connection with the cordon in Harlem Park or the investigation into Detective Suiter's death.

60.     None of the police officers who demanded her identification asked her any questions about or related to the shooting of Detective Suiter.

d.     <u>Juaqueta Bullock</u>

61.     On Wednesday, November 15, Plaintiff Juaqueta Bullock was with her daughter Lauren at track practice at the recreation center attached to Lauren's school when Detective Suiter suffered his gunshot wound.  Her other children were home with a family friend.

62.    Ms. Bullock and her daughter walked home after practice, at around 7:00 PM, but encountered the BPD police cordon when they reached Fremont Street at Murphy Lane. There, a BPD officer—without a reasonable articulable suspicion that they had committed, were committing, or were about to commit a crime—stopped them and told them that they could not enter the cordoned area to go home, despite Ms. Bullock showing the officer her identification showing that she lived within the cordoned area.  Ms. Bullock and her daughter waited in the cold, outside the cordon, for over an hour until another BPD officer finally escorted them home between 8:30 and 9:30 PM.  Ms. Bullock was extremely frustrated, given that she and her daughter were already tired and hungry from being at work or school all day and participating in an after-school event.

63.    The following morning, November 16, when Ms. Bullock attempted to take her daughter Lauren to school, a BPD officer—without a reasonable articulable suspicion that she had committed, was committing, or were about to commit a crime—stopped them and questioned Ms. Bullock about where they were going, what school Lauren attended, and demanded that Ms. Bullock show her identification.  Ms. Bullock felt like she was being harassed.  Although the BPD officer did not stop Ms. Bullock when she left the neighborhood to pick her daughter up from track practice at 7:00 PM, an officer, again without reasonable articulable suspicion that they had committed, were committing or were about to commit a crime, stopped them and required Ms. Bullock to show identification when they walked home.

64.    On Friday, November 17, BPD officers, again without reasonable articulable suspicion that they had committed, were committing, or were about to commit a crime, repeatedly stopped Ms. Bullock and her daughter at the cordon when walking to and from school, questioned them about their destination, and required Ms. Bullock to show identification.

65.     BPD officers—without a reasonable articulable suspicion that she had committed, was committing, or were about to commit a crime—also stopped Ms. Bullock's older daughter, Bria Drakes, made her show her identification, and questioned her every time she entered and left the cordoned neighborhood to go to work at Old Navy or to attend college at Coppin State University.

66.     On Saturday, November 18, BPD officers—without a reasonable articulable suspicion that she had committed, was committing, or were about to commit a crime—stopped Ms. Bullock and a friend on their way back to Ms. Bullock's home after grocery shopping at Wal-Mart.  While Ms. Bullock normally would have pulled up right in front of her house to unload her groceries, on that day she was stopped by BPD officers at the cordon about a block away from her home on Franklin Street and had to show her identification in order to be allowed to go home.

67.     Ms. Bullock felt that the repeated police stops and the questioning served no purpose, particularly since the officers said that they were looking for a male suspect, so she could not see any sense in stopping, questioning, and demanding identification from women and young children.  She thought that the residents of Harlem Park were being treated differently than people in other neighborhoods, and that the BPD officers simply did not care how their actions affected people in the neighborhood.  She also thought it unfair for the police to treat the entire neighborhood as suspects, when there was no basis to do so.  The entire experience of the lockdown felt like police harassment to her.

68.     Ms. Bullock wants her name and personal information, which she was required to give, removed from any police database or records, in connection with the cordon in Harlem Park or the investigation into Detective Suiter's death.

69.     None of the BPD officers who stopped Ms. Bullock at the cordon asked her any questions related to the shooting of Detective Suiter.

**D.     Preconditions to Suit**

70.     Plaintiffs Nicole Lee, and Luella Lawson timely filed notices of tort claims pursuant to the Local Government Tort Claims Act on November 15, 2018.

71.     Defendants Baltimore Police Department and Mayor and City Council of Baltimore had actual and constructive notice of the circumstances giving rise to Plaintiffs Lauren Holmes and Juaqueta Bullock's injuries within one year of the injury as a result of, *inter alia*, the monitoring team's first monitoring report, Baltimore Police Department Monitoring Team, First Semiannual Report (July 18, 2018), available at https://www.bpdmon itor.com/s/BPD-First-Semiannual-Report-7-18-18.pdf, which details the ways in which the BPD's actions in Harlem Park were improper.


**PLAINTIFFS' CLAIMS**

**COUNT I**
**Section 1983 Claim for Violation of Plaintiffs' Fourth and Fourteenth Amendment Rights**
(Against All Defendants)

72.     Plaintiffs incorporate by reference paragraphs 1 through 71 as if fully set forth herein.

73.     The actions of BPD officers described above, including, *inter alia*, (i) stopping Plaintiffs without reasonable articulable suspicion that they had committed, were committing, or were about to commit a crime, when they sought to enter, leave, or move about the cordoned area; (ii) requiring Plaintiffs to identify themselves, provide their address, date of birth, driver's license or state identification number, phone number, and to produce this information in order to come or go from or to their homes; and (iii) retaining such illegally obtained information, or

using it to search police databases, violated Plaintiffs' rights guaranteed by the Fourth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment.

74.     The actions of BPD officers complained of herein constituted official policy of the BPD and City of Baltimore because they were taken at the direction of these Defendants' policymaking officials, were ratified by those officials, or those officials failed to remedy those violations despite knowing that they were occurring.

75.     As an actual and proximate result of the illegal conduct of Defendants the City of Baltimore, BPD, Kevin Davis and John Does 1-10, Plaintiffs have suffered damages.

**COUNT II**
**Violation of Maryland Declaration of Rights, Art. 26**
(Against Individual Defendants)

76.     Plaintiff incorporates by reference paragraphs 1 through 71 as if fully set forth herein.

77.     The actions of BPD officers described above, including, *inter alia*, stopping Plaintiffs without reasonable articulable suspicion that they had committed, were committing or were about to commit a crime, when they sought to enter, leave, or move about the cordoned area, (ii) requiring Plaintiffs to identify themselves, provide their address, date of birth, driver's license or state identification number, phone number, and to produce this information to come and go from their homes; and (iii) retaining such illegally obtained information, or using it to search police databases, violated Plaintiffs' rights guaranteed by Article 26 of the Maryland Declaration of Rights.

78.     Defendants Kevin Davis and John Does 1-10 are liable for the actions of the BPD officers complained of herein because they directed or ratified them, or those officials failed to remedy those violations despite knowing that they were occurring.

79.     Defendants Kevin Davis and John Does 1-10 acted with malice, ill will, improper motive, or gross negligence.

80.     As an actual and proximate result of the illegal conduct of Defendants Kevin Davis and John Does 1-10, Plaintiffs have suffered damages.

## COUNT III
### Violation of Maryland Declaration of Rights, Art. 24
(Against Individual Defendants)

81.     Plaintiff incorporates by reference paragraphs 1 through 71 as if fully set forth herein.

82.     The actions of BPD officers described above, including, *inter alia*, prohibiting plaintiffs from moving freely about their neighborhood, restricting plaintiffs from freely entering or exiting their own homes, and traveling to and from their desired destinations violated Plaintiffs' right to intrastate travel as guaranteed by Article 24 of the Maryland Declaration of Rights.

83.     Defendants Kevin Davis and John Does 1-10 are liable for the actions of the BPD officers complained of herein because they directed or ratified them, or those officials failed to remedy those violations despite knowing that they were occurring.

84.     Defendants Kevin Davis and John Does 1-10 acted with malice, ill will, improper motive, or gross negligence.

85.     As an actual and proximate result of the illegal conduct of Defendants Kevin Davis and John Does 1-10, Plaintiffs have suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, each Plaintiff respectfully requests that the Court enter judgment in her or his favor and against the Defendants, and award the following relief:

A.      Declare that the Defendants violated rights guaranteed to Plaintiffs by the U.S. Constitution and the Maryland Declaration of Rights by illegally stopping them without reasonable articulable suspicion that they had committed, were committing, or were about to commit a crime, and requiring them to identify themselves, provide their address, date of birth, driver's license number, and phone number, and produce identification, and retaining such information illegally obtained during the investigatory stops, and by restricting their ability to travel to and from their desired destinations.

B.      Issue a permanent injunction prohibiting Defendants from establishing a neighborhood lockdown like the one complained of herein: establishing a cordon far beyond the reasonable limits of a crime scene; prohibiting persons from entering or leaving the cordoned area without identification showing that they are residents; subjecting persons wishing to enter or leave the cordoned area to investigatory stops without reasonable articulable suspicion that they had committed, were committing, or were about to commit a crime; requiring those stopped individuals to show identification; retaining such illegally obtained identifying information; and by restricting travel into or out of the cordoned area.

C.      Issue a permanent injunction requiring the BPD to disgorge or destroy all personal information obtained from Plaintiffs and others during the relevant period.

D.       Award Plaintiffs compensatory and punitive damages (punitive damages are sought against only the individual capacity defendants) for the constitutional injuries inflicted upon them.

E.      Award Plaintiffs their costs, interest, and reasonable attorney's fees in this action.

F.      Grant Plaintiffs such other relief as this Court may deem just and proper.

Dated:  November 25, 2019

Respectfully submitted,

/s/ Daniel W. Wolff
Daniel W. Wolff (D. Md. Bar No. 19940)
Astor Heaven (D. Md. Bar No. 18705)
Helen Osun (D. Md. Bar No. 21139)
Siri Rao (*pro hac vice* pending)

CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
Fax: (202) 628-5116
dwolff@crowell.com
aheaven@crowell.com
hosun@crowell.com
srao@crowell.com

David R. Rocah (D. Md. Bar No. 27315)
American Civil Liberties Union Foundation
of Maryland
3600 Clipper Mill Road, Suite 350
Baltimore, MD 21211
Tel: (410) 889-8555
Fax: (410) 366-7838
rocah@aclu-md.org

*Attorneys for Plaintiffs*